UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CR. NO. 1:26-CR- |
| | : | |
| v. | : | |
| | : | (Judge            ) |
| **SKYLER GARMAN**, | : | |
| Defendant. | : | (Filed Electronically) |

# INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

At times material to this Information:

## BACKGROUND

1. Defendant SKYLER GARMAN was a resident of Lebanon County, Pennsylvania, in the Middle District of Pennsylvania.

2. COCONSPIRATOR 1 was a resident of the District of New Jersey and a former professional bodybuilder.

3. The Food and Drug Administration (FDA) was the agency of the United States responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and Cosmetic Act (FDCA) 21 U.S.C. § 301, *et seq.* FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of drugs shipped or received in interstate commerce. A purpose of the FDCA was to

ensure that drugs sold for human use were safe and effective and bore labeling that contained true and adequate information and that foods, including dietary supplements, were safe and properly labeled.

4. The FDCA defined a "drug," in relevant part, as any article (a) recognized in the official United States Pharmacopeia or official National Formulary, (b) intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animal, (c) intended to affect the structure or any function of the body (other than food), or (d) used as a component of any article specified in the foregoing clauses.

5. The FDCA defined a "dietary supplement," in relevant part, as a product: (a) intended to supplement the diet that contains one or more of a list of dietary ingredients, e.g., a vitamin, mineral, herb or other botanical, amino acid, or other dietary substance for use by man to supplement the diet by increasing total dietary intake, and (b) labeled as a dietary supplement.

6. It was unlawful under the FDCA to distribute in interstate commerce any new drug that had not been approved by the FDA.

7. It was unlawful under the FDCA to introduce or deliver for introduction into interstate commerce any drug, or a dietary supplement, that was misbranded. Misbranding could occur, for example, through false and misleading labeling and, in the case of a prescription drug, if it was dispensed without a valid prescription from a licensed medical professional.

8. Under federal law, steroids were generally regulated under the Controlled Substances Act (CSA). Many steroids were useful for medical conditions and were also regulated by the FDCA as prescription drugs.

9. Products containing SARMs were often marketed and sold for body-building purposes, i.e., to increase muscle mass. Athletes and bodybuilders who desired the muscle-building effects of steroids turned to products collectively called selective androgen receptor modulators (SARMs). SARMs were synthetic chemicals designed to mimic the effects of testosterone and/or other anabolic steroids. SARM products were originally developed by drug companies as an alternative to anabolic steroids for people who suffered from age and disease-related muscle loss. FDA did not approve any of these products for therapeutic use.

10. There were known safety concerns associated with SARMs, including that they increased the risk of heart attack, stroke, and liver damage. In October 2017, FDA issued a public safety alert about the risks associated with SARMs.

11. Around the same time, FDA's Center for Drug Evaluation and Research issued Warning Letters to three firms distributing products that contained the SARMs Ostarine (a.k.a., MK-2866) and LGD-4033 (a.k.a., Ligandrol). In the Warning Letters, FDA stated that products containing SARMs were unapproved new drugs and misbranded prescription drugs.

12. Selective estrogen receptor modulators (SERMs) were a group of nonsteroidal compounds that had estrogen-like effects on some tissues but antiestrogen effects on other tissues. The SERMs class of drugs included branded drugs such as Tamoxifen, Exemestane, and Clomiphene. SERMS were used by bodybuilders as a post-cycle therapy to counteract the unwanted side effects of Performance Enhancing Drugs (PEDs), including synthetic steroids, anabolic steroids, and SARMs. These side effects were caused by the infusion of estrogen into the body, which could cause breast enlargement in men, fat deposits,

and erectile dysfunction. SERMs were typically used by bodybuilders and other athletes after an individual stopped taking, cycling, or using PEDs.

13. SKYLER GARMAN opened Body Science Supplements, a health and wellness store that sold vitamins and supplements, at or around Cumberland Street, in Lebanon, Pennsylvania on or about March 30, 2019.

## COUNT 1
18 U.S.C. § 371
(Conspiracy)

14. Paragraphs 1 through 13 are incorporated here.

15. From in or around 2019 until in or around 2021, in Lebanon County, within the Middle District of Pennsylvania, and elsewhere, the defendant,

**SKYLER GARMAN**,

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the United States, to defraud the United States and to commit offenses against the United States, that is:

To devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises and to willfully participate in such a scheme and artifice with knowledge of its fraudulent nature, with the intent to defraud, and, for the purpose of executing such scheme and artifice, depositing and causing to be deposited any matter or thing whatever to be sent and delivered by any private or commercial interstate carrier, and taking and receiving from an authorized depository or mail matter any matter or thing, in violation of 18 U.S.C. § 1341 (Mail Fraud).

To introduce and deliver into interstate commerce any new drug that is not the subject of a new drug application approved by the FDA, in violation of 21 U.S.C. § 331(d), 355(a); and,

To introduce and deliver into interstate commerce any drug that is adulterated and misbranded, in violation of 21 U.S.C. § 331(a).

## MANNER AND MEANS OF THE CONSPIRACY

16. SKYLER GARMAN and COCONSPIRATOR 1 were business partners in multiple enterprises, including Body Science Supplements, Savior Research SARMS, and Savior Research SERMS.

17. SKYLER GARMAN and COCONSPIRATOR 1, through Body Science Supplements, sold products under the brands Savior Research SARMS and Savior Research SERMS, including products by the names of "A-ADEX," "AROMA," "BOOST," "LOTS OF LIBIDO," "NOVA," "RESTART," and "SHREDDED."

18. SKYLER GARMAN and COCONSPIRATOR 1 did not obtain an approved new drug application or Abbreviated New Drug Application (ANDA) for any of the SARMs they sold or for any of the drugs that they marketed and sold as SERMs.

19. SKYLER GARMAN and COCONSPIRATOR 1 placed labels on their product bottles such as "For Research Purposes Only" and "Not for Human Consumption" while simultaneously advertising the same products for human consumption and instructing purchasers on how to consume the products and on how the products would change the structure and function of the body, including through muscle development.

20. SKYLER GARMAN and COCONSPIRATOR 1 placed labels on their product bottles describing drugs as "dietary supplements."

21. SKYLER GARMAN and COCONSPIRATOR 1 used U.S. Mail and FedEx to obtain unapproved and misbranded drugs from suppliers outside of the Middle District of Pennsylvania and to ship unapproved and misbranded drugs to their customers.

22. SKYLER GARMAN and COCONSPIRATOR 1 sold over $2.2 million in products, the large majority of which was comprised of unapproved and misbranded drugs. SKYLER GARMAN made approximately $180,000 in profit from this unlawful activity.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

23. On or about December 24, 2019, Body Science Supplements announced, through Facebook, that it would begin selling products supplied by Savior Research SERMS in conjunction with COCONSPIRATOR 1. For instance, one product was BOOST, which was misbranded as a dietary supplement while simultaneously being advertised as a way to boost metabolism, assist in burning fat, and facilitate weight loss. One individual asked in response, "In house now?" SKYLER GARMAN responded, "We dropped 7 products!"

24. On or about December 26, 2019, Body Science Supplements, through Facebook, posted a chart comparing Savior Research SERMS products with either branded drugs sold by specific manufacturers or other drugs. The chart compared Savior Research SERMS products to, among other drugs, Arimidex®, Nolvadex®, Viagra®, and Clenbuterol. The first three were brand name prescription drugs, while the last was a drug not approved for use by humans in the United States.

25. On or about April 19, 2020, Body Science Supplements announced, through Facebook, that it was launching the product line Savior Research SARMS, including Ostarine (a.k.a., MK-2866) and LGD-4033 (a.k.a., Ligandrol).

26. On or about April 20, 2020, Body Science Supplements, through Instagram, announced the release of Savior Research SARMS products. A photo showed SKYLER GARMAN and COCONSPIRATOR 1 and listed them both as owners. A caption to the photo said that they were "offering FREE cycle advice with the purchase of any product." "Cycle advice" referred to advice on how to consume the products in sequence with PEDs and other SARMs.

9

27. The website for Body Science Supplements made claims regarding the effects that Savior Research SARMS products would have on the structure and function of the body, including "increased muscularity," and it provided dosing instructions to customers, while the product labels simultaneously claimed that the products were "not for human consumption."

28. From about April 2020 to about January 2021, SKYLER GARMAN and COCONSPIRATOR 1, using a SAVIOR RESEARCH SERMS LLC business checking account at Wells Fargo on which SKYLER GARMAN and the girlfriend of COCONSPIRATOR 1 were signatories, executed a series of wire transfers to a bank account for a SARMs supplier based in another state.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
18 U.S.C. § 1956(h)
(Conspiracy to Launder Monetary Instruments)

29. Paragraphs 1 through 13 and 16 through 28 are incorporated here.

30. From in or around 2019 until in or around 2021, in the Middle District of Pennsylvania and elsewhere, the defendant,

## SKYLER GARMAN,

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a. To knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, mail fraud, with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b. To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified

unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

MANNER AND MEANS OF THE CONSPIRACY

32. SKYLER GARMAN and COCONSPIRATOR 1, using the same SAVIOR RESEARCH SERMS LLC business checking account at Wells Fargo on which SKYLER GARMAN and the girlfriend of COCONSPIRATOR 1 were signatories, executed a series of wire transfers to bank accounts associated with COCONSPIRATOR 1, as payment to COCONSPIRATOR 1 individually, including but not limited to a wire transfer in the amount of approximately $13,000 on or about April 30, 2021.

33. SKYLER GARMAN and COCONSPIRATOR 1, using the same SAVIOR RESEARCH SERMS LLC business checking account at Wells Fargo on which SKYLER GARMAN and the girlfriend of COCONSPIRATOR 1 were signatories, also executed a series of wire transfers to bank accounts associated with SKYLER GARMAN, as

payment to SKYLER GARMAN individually, including but not limited to a wire transfer in the amount of approximately $6,000 on or about September 8, 2021.

34. SKYLER GARMAN and COCONSPIRATOR 1, using the same SAVIOR RESEARCH SERMS LLC business checking account at Wells Fargo on which SKYLER GARMAN and the girlfriend of COCONSPIRATOR 1 were signatories, also executed a series of transfers to pay for personal expenses incurred using an American Express card in the name of COCONSPIRATOR 1's girlfriend, including but not limited to ACH transfers in the amounts of approximately $2,700 and $1,200 on or about November 5, 2021 and November 29, 2021, respectively.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION

The allegations contained in Counts 1 and 2 of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.

Pursuant to Title 18, United States Code, Sections 981 and 982,

and Title 28, United States Code, Section 2461, upon conviction of the offense in Counts 1 and 2 of this Information, the defendant,

### SKYLER GARMAN,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the violations charged; and any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to:

    a. $180,000.00 in U.S. currency as a forfeiture money judgment representing proceeds that the defendant owned, benefited from, or possessed.

If any of the property described above, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.

BRIAN D. MILLER
United States Attorney

_____          ___1/30/2026___
RAVI ROMEL SHARMA                Date
Assistant United States Attorney